IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** : | Case: 1:22-mj-00026 |
|  : | Assigned to: Judge Meriweather, Robin M. |
|  : | Assign Date: 2/9/2022 |
| **v.** : | Description: COMPLAINT W/ ARREST WARRANT |
|  : | **VIOLATIONS:** |
| **CHARITY KEYS, and** : | |
|  : | **18 U.S.C. § 371 (Conspiracy)** |
| **LOUIS J. "JOEY" MITCHELL** : | |
|  : | **18 U.S.C. § 201(b)(2) (Bribery)** |
| **Defendants** : | |

**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT
AND ARREST WARRANTS**

I, Garrett Churchill, being first duly sworn, hereby depose and states as follows:

**PURPOSE OF THE AFFIDAVIT**

1. This Affidavit is submitted in support of Criminal Complaints charging CHARITY KEYS ("KEYS") and LOUIS J. MITCHELL, III ("MITCHELL") with violations of 18 U.S.C. § 371 (conspiracy) and 18 U.S.C. § 201(b)(2) (bribery). As described further below, there is probable cause to believe that KEYS and MITCHELL, both employees of the District of Columbia Fire and Emergency Medical Services Department ("FEMS"), conspired with each other and a D.C. vendor to engage in a bribery scheme through which MITCHELL and KEYS directed or caused to be directed FEMS contracts and payments to the vendor in exchange for cash payments.

**BACKGROUND OF AFFIANT**

2. I am a Special Agent with the Federal Bureau of Investigation ("FBI") Washington Field Office. I have been in this position since September 30, 2019, and am currently assigned to investigate public corruption and government fraud in the District of Columbia. My primary responsibilities include conducting and assisting with investigations involving public corruption, fraud, and other related violations of federal criminal law. I received a Juris Doctorate from the

University of Georgia and have been a member in good standing of the State Bar of Georgia since 2010. During my training at the FBI Academy, Quantico, Virginia, I have received training in a variety of investigative and legal matters, including physical surveillance, legal statutes and procedures, financial investigations, confidential source management, Fourth Amendment searches, the drafting of search warrant affidavits, probable cause and digital forensic data analysis.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies. Because this Affidavit is submitted for the limited purpose of establishing probable cause to support an application for an arrest warrant, it does not contain every fact known by me or the United States. The dates listed in this Affidavit should be read as "on or about" dates. Unless specifically indicated, all conversations and statements described in this affidavit are related in substance and in part only and are not intended to be a verbatim recitation of such statements. All times provided in this affidavit should be read as "on or about" times and are given in Eastern Standard Time unless otherwise noted.

## **STATEMENT OF FACTS SUPPORTING PROBABLE CAUSE**

### *Background*

4. MITCHELL is a warehouse supply technician for FEMS. As a warehouse supply technician, MITCHELL works in the FEMS supply warehouse in Washington, D.C., and is responsible for managing the receipt of goods, such as office supplies, to the warehouse, including confirming that deliveries have been made as promised under supplier contracts with FEMS.

5. KEYS is a contract administrator for the FEMS. As a contract administrator, KEYS manages blanket purchase agreements between FEMS and various vendors. As part of her duties,

KEYS solicits bids for purchase orders, issues purchase orders, and confirms invoices from vendors for payment.

6. Contractor 1 is the owner of Company 1 and various related shell entities. Company 1 is an approved vendor for the D.C. government and has held several contracts with various D.C. government agencies, including FEMS.

7. Beginning in October 2019, the FBI and D.C. Office of Inspector General have been conducting an investigation spurred by allegations of irregularities related to FEMS and Contractor 1. In particular, although FEMS had ordered, paid for, and allegedly received supplies from Contractor 1 and Company 1, FEMS was experiencing supply shortages of items allegedly supplied by Contractor 1 and Company 1.

8. Information obtained in the investigation has shown that since in or about 2016, KEYS, MITCHELL, and Contractor 1 have engaged in a bribery conspiracy, in which KEYS and MITCHELL performed official acts and/or omitted their official duty to benefit Contractor 1 and Company 1, and in exchange, Contractor 1 made payments to KEYS and MITCHELL.

9. As described further below, the bribery scheme among KEYS, MITCHELL, and Contractor 1 included the following general pattern. First, KEYS and MITCHELL directed or caused to be directed purchase agreements and purchase orders to Company 1. Contractor 1 then submitted invoices for payment for the delivery of goods under the purchase orders, and KEYS and MITCHELL confirmed delivery of the goods so that the invoices could be paid. As part of the scheme, however, KEYS and MITCHELL approved the invoices even though Contractor 1 and his companies over-charged FEMS for goods and/or did not deliver the goods as required.

10. In exchange, Contractor 1 split the funds he received based on the fraudulent invoices with MITCHELL and KEYS.

*Examples of Payments and Official Acts/Omissions of Duty*

11.     Based on a wide variety of records and information gathered in the course of the investigation, including records from FEMS, financial records, and text message communications, investigators identified several instances in which KEYS and MITCHELL worked together to direct FEMS purchase orders to Company 1 or to approve invoices from Company 1 for payment at or around the same times that MITCHELL, KEYS, and Contractor 1 arranged for cash payments from Contractor 1 to MITCHELL and KEYS.  These instances include the following examples:

<u>Sept.-Oct. 2018: Renewal of contract, issuance of purchase order, and $40,000 payment to MITCHELL and KEYS</u>

12.     On September 6, 2018, KEYS texted MITCHELL indicating that she was not going to renew a contract with "him."  The next day, September 7, 2018, MITCHELL sent KEYS's text to Contractor 1.  Contractor 1 responded, "Wow."  Three days later, on September 10, 2018, MITCHELL texted Contractor 1 again, stating, "I got her she gonna renew tom."

13.     Records obtained from FEMS show that, four days later, on September 14, 2018, KEYS initiated the renewal of a $200,000 blanket purchase agreement between FEMS and Company 1.  Pursuant to the agreement, on October 2, 2018, KEYS issued a $100,000 purchase order to Company 1.

14.     A week later, on October 9, 2018, Contractor 1 submitted an invoice under the purchase order for $71,468.55 to FEMS.  KEYS confirmed receipt of goods, thus confirming the invoice for payment, on October 15, 2018.

15.     Subsequently, on October 22, 2018, MITCHELL texted Contractor 1 a routing number for a bank account that financial records show is held solely in MITCHELL's name ("the MITCHELL Account").  On the same day, KEYS texted MITCHELL the routing number and account information for a bank account that financial records show is held in KEYS's name ("the

4

KEYS Account"). On the same day, Contractor 1 transferred $40,000 from a bank account on which he was the sole signatory to the MITCHELL Account. On the following day, October 23, 2018, MITCHELL transferred $20,000 from the MITCHELL Account to the KEYS Account.

Nov.-Dec. 2018: payment of invoice and $14,000 payment to MITCHELL and KEYS

16. According to records obtained from FEMS, on November 27, 2018, Contractor 1 submitted to FEMS an invoice against the $100,000 purchase order KEYS had issued to Company 1 on October 2, 2018, for $23,344.70. Keys confirmed receipt of the goods so that FEMS would pay the invoice on November 27, 2018.

17. According to financial records, on December 5, 2018, a $14,000 cashier's check, payable to MITCHELL, was issued from a bank account controlled by Contractor 1 and held in the name another company operated by Contractor 1. There was no memo line on the check. The same day the check was issued, MITCHELL texted Contractor 1, "Call me when you ready don't come everyone is here wait to deliver when nobody's here quantity wise." Based on information gathered in the investigation, I believe this message represents MITCHELL's directing Contractor 1 to meet him at the FEMS supply warehouse to provide MITCHELL the check, and that MITCHELL was instructing Contractor 1 not to come until fewer employees were present at the warehouse to prevent possible detection of their scheme.

18. The same day, December 5, 2018, MITCHELL deposited the $14,000 check into the MITCHELL Account. Five days later, on December 10, 2018, MITCHELL transferred $7,000 from the MITCHELL Account to the KEYS Account.

May 2019: Payment of invoice and $20,000 payment to MITCHELL and KEYS

19. According to records obtained from FEMS, on April 29, 2019, KEYS submitted a requisition request for office supplies from Company 1 for $50,000. On May 1, 2019, KEYS

5

issued a purchase order under the request for $49,500 to Company 1. The same day, Contractor 1 submitted an invoice to FEMS for $49,500. The invoice was directed to MITCHELL's attention. On May 2, 2019, KEYS confirmed receipt of the purchased goods so that the invoice submitted the prior day could be paid.

20. On May 13, 2019, MITCHELL texted Contractor 1, "What's good we need to go over this order before you place it so I could give you some numbers." Based on information obtained in the investigation, I believe that in this message, MITCHELL is requesting a conversation with Contractor 1 so that MITCHELL and Contractor 1 can identify what supplies on the purchase order issued on May 1, 2019, Company 1 should not purchase and deliver so as to create a profit or cushion for a kickback.

21. The next day, on May 14, 2019, MITCHELL and Contractor 1 exchanged communications to set a meeting location "near the store." Contractor 1's last observed text to MITCHELL on that date indicated that Contractor 1 would meet MITCHELL 15 minutes. I believe that references to "the store" meant the physical location of Company 1 in Maryland, which was close in proximity to the residential addresses of both Contractor 1 and MITCHELL.

22. Later on the same day, KEYS texted MITCHELL, "Did you get it." MITCHELL responded, "Yes."

23. According to financial records, the same day, on May 14, 2019, a cashier's check for $20,000, payable to MITCHELL, was issued from a bank account controlled by Contractor 1 and association with another of his companies. There was no memo line on the check.

24. The next day, May 15, 2019, MITCHELL negotiated the check at a bank in Maryland, depositing $10,000 of it into the MITCHELL Account and keeping $10,000 of it in cash. The same day, MITCHELL texted KEYS, "send me account number." Later the same day,

MITCHELL transferred $8,000 from the MITCHELL Account to the KEYS Account. Approximately one week later, on May 21, 2019, MITCHELL transferred $2,200 from the MITCHELL Account to the KEYS Account.

### *Other Payments to MITCHELL and KEYS from Contractor 1*

25. Investigators have identified evidence of additional payments Contractor 1 made to MITCHELL, including:

| Date | Amount | Means |
|---|---|---|
| 12/20/2016 | $12,000 | Cashier's check with memo line "bike" drawn on Company 1 account and payable to MITCHELL |
| 11/2/2017 | $16,000 | Cashier's check with memo line "1971 Impala" drawn on Company 1 account and payable to MITCHELL |
| 7/27/2018 | $16,000 | Cashier's check with no memo line drawn on a Contractor 1-controlled account and payable to MITCHELL |
| 12/23/2019 | $5,500 | Transfer from Contractor 1's Paypal account to MITCHELL's wife's PayPal account |

### *KEYS's and MITCHELL's Statements to Law Enforcement*

26. On September 29, 2020, FBI agents attempted voluntary interviews with MITCHELL and KEYS at their respective residences.

27. KEYS agreed to a voluntary interview and generally admitted to accepting money from MITCHELL due to her own financial needs. She claimed, however, that she was unaware of any financial relationship between MITCHELL and Contractor 1 or that MITCHELL was a conduit for payments to KEYS from Contractor 1 in return for signing off on payment for the delivery of non-existent goods and services by Company 1. KEYS denied receiving any money directly from Contractor 1.

28. MITCHELL also agreed to a voluntary interview and stated that Contractor 1 had never provided him with anything of value in return for signing off on payment for the delivery of

non-existent goods and services by Company 1.  When confronted with copies of various cashier's checks from Contractor 1 to MITCHELL, MITCHELL stated that Contractor 1 had previously bought a 1971 Impala from MITCHELL and that the payment was for said vehicle and that the payment was not related to MITCHELL's duties at FEMS or the professional relationship between Contractor 1 and MITCHELL.  MITCHELL claimed that Contractor 1 may have given him cash on at least one occasion, but that the cash was intended to pay for food and refreshments at a FEMS employee barbeque.

29.     Subsequently, MITCHELL contacted investigators and requested an additional opportunity to explain his transactions with Contractor 1.  In a recorded interview with investigators, MITCHELL generally stated that Contractor 1 and MITCHELL had engaged in many financial transactions and that MITCHELL could not provide specific details on the amounts of these transactions, but that any financial transactions that investigators had observed or would find in the future between MITCHELL and Contractor 1 were related to business outside of Contractor 1 and MITCHELL's professional relationship.  MITCHELL stated that these transactions generally consisted of the sales of vehicles from MITCHELL to Contractor 1 and/or "loans" from Contractor 1 that MITCHELL requested from Contractor 1 and that MITCHELL would then pay back.  MITCHELL was not able to produce any documentation substantiating the sale of the referenced vehicles, and investigators were unable to locate any such documentation. In a review of financial records, investigators also were unable to identify any payments from MITCHELL to Contractor 1.

## CONCLUSIONS OF AFFIANT

30. Based on the foregoing, I submit that there is probable cause to believe that KEYS and MITCHELL violated:

    a. 18 U.S.C. § 371, which makes it a crime for two or more persons to conspire to commit an offense against the United States, here, bribery, in violation of 18 U.S.C. § 201(b)(2), and for one or more of such persons to do any act to effect the object of the conspiracy; and

    b. 18 U.S.C. § 201(b)(2), which makes it a crime for any public official to, directly or indirectly, corruptly demand, seek, receive, accept, or agree to receive or accept anything of value personally or for any other person or entity, in return for being influenced in the performance of an official act or for being induced to do or omit to do any act in violation of the public official's official duty.

31. As such, I respectfully request that the court issue arrest warrants for KEYS and MITCHELL.

_____
SPECIAL AGENT GARRETT S. CHURCHILL
FEDERAL BUREAU OF INVESTIGATION

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone, this 9th day of February, 2022.

_____
HON. ROBIN M. MERIWEATHER
U.S. MAGISTRATE JUDGE

9